UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Criminal No. 16-339(MJD/FLN)

UNITED STATES OF AMERICA,

    Plaintiff,

v.

PRESTON E. FORTHUN,
ABDISALAN A. HUSSEIN, and
CARLOS P. LUNA,

    Defendants.

**GOVERNMENT'S CONSOLIDATED RESPONSE TO DEFENDANTS' MOTIONS FOR JUDGMENT OF ACQUITTAL**

The United States of America, by and through its attorneys, Gregory G. Brooker, United States Attorney for the District of Minnesota, and John Kokkinen and Amber Brennan, Assistant United States Attorneys, respectfully submits this response to the motions for judgment of acquittal filed by Preston E. Forthun [Docket No. 421], Abdisalan A. Hussein [Docket No. 425], and Carlos P. Luna [Docket No. 423].

## INTRODUCTION

This case is and always has been about lying to, hiding from, and trying to trick car insurance companies. The search warrant and the indictment alleged, and the evidence at trial proved, that the existence of runner payments was important to insurance companies. It was material. It was something that, if learned about, would be capable of influencing the insurance company's decision about how to handle a claim, whether to pay chiropractic bills, whether to pay bills with no questions asked or to instead open an investigation, or whether to file a lawsuit, among other things. During the pretrial litigation in this case, this

Court rejected the defendants' theory that, as a matter of law, the only thing that can be material to an insurance company is the medical necessity and reasonableness of the chiropractic services. (*See* September 25, 2017 Order [Docket No 343] at 7-8.) At trial, after hearing all of the evidence, the arguments of the parties, and receiving properly tailored jury instructions, the jury rejected the defendants' theory that, as a matter of fact, the only thing that can be material to an insurance company is the medical necessity and reasonableness of the services. Or the jury found that the evidence supported the view that the insurance companies were billed for services that were unnecessary or unreasonable. Or it was a combination of the two. Either way, the evidence and all reasonable deductions and inferences drawn therefrom supported the verdict. The evidence also supported the jury's finding that Hussein and Luna joined in an agreement with others and acted with intent to defraud. The Court should deny the motions for judgment of acquittal.

## **ARGUMENT**

Rule 29(a) of the Federal Rules of Criminal Procedure provides that the court, on the defendant's motion, must enter judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction. A motion for judgment of acquittal should be denied where the evidence, viewed in the light most favorable to the government, is such that a reasonable jury could have found each of the essential elements of the crime beyond a reasonable doubt. *United States v. Moyer*, 182 F.3d 1018, 1021 (8th Cir. 1999) (citations omitted). In considering a motion for judgment of acquittal, the court must resolve all conflicts about the evidence in the government's favor and must accept all

reasonable inferences that would support the verdict. *United States v. Keys*, 721 F.3d 512, 518-519 (8th Cir. 2013).

I.  **Forthun's Motion For Judgment Of Acquittal**

In moving for judgment of acquittal, Forthun raises only one issue: whether the evidence elicited at trial was sufficient to support the materiality element of the conspiracy and fraud charges. Forthun argues that the evidence established that the insurance companies are required to pay for all medically necessary and reasonable services and that they may not deny payment based on the fact that a runner had been paid to recruit and refer the patient to the chiropractic clinic. Therefore, Forthun claims, the practice at his clinics, Comp Rehab, of paying kickbacks to runners cannot be material to the insurance companies unless the evidence proves that the kickbacks were accompanied by medically unnecessary or unreasonable services. The argument is without merit.

"Materiality" means having "a natural tendency to influence, or [being] capable of influencing, the decision of a reasonable person in deciding whether to engage or not to engage in a particular transaction." (Jury Instructions [Docket No. 384] at 25.) Every insurance company witness testified that the involvement of a runner and the existence of payments to runners in exchange for recruiting and referring patients to a clinic is something that is important to the insurance company and would influence their decision about how to evaluate the overall claim and the related bills from a chiropractic clinic. (*See generally* Trial Tr. 238:5-239:7 (R. Berg – Farmers Insurance); 572:8-576:5 (A. Cobb – Farmers Insurance); 638:14-641:13 (B. Prentice – Travelers); 670:16-672:14 (M. Hair – Progressive); 977:17-980:7 (L. Vanderwerff – State Farm); 1347:5-1350:5 (M. Struebing

3

– Liberty Mutual)). Contrary to Forthun's argument, insurance company witnesses did testify that if the insurance company discovered that a chiropractor was paying runners, that could, by itself, result in a denial of payment:

- A. Cobb: "if, in the claims handling, we understood that there was some running going on, we wouldn't pay that claim . . . ." (*Id.* 576:1-3.)

- B. Prentice: "Q. And what does Travelers do if they were to find out about payment to a runner or to a patient? A. We would definitely investigate further to find out, you know, what was going on and potentially deny the claim . . . ." (*Id.* 642:2-6.)

If discovered after the claim had been paid, it could also result in an action by the insurance company to recover that money:

- L. Vanderwerff: "Q. Would there be any action that State Farm could take to try to recover that money after it had already been paid? A. Again, depending upon the number of instances and things that we have, I believe we could try to collect back from the provider." (*Id.* 98:3-7.)

The insurance company witnesses explained that the employment of runners calls into question the entirety of the claim and the fundamental premise of insurance—namely, to indemnify for losses, not make a profit for the insured or some undisclosed third party. (*Id.* 575:11-576:10, 601:11-13.) The insurance company witness testified that a chiropractor's use of a runner influences their decisions about how to handle claims because it indicates that the chiropractor is inflating the treatment plan—a fact that Darryl Humenny, Forthun's business partner, confirmed happened at Comp Rehab, (*id.* 739:25-

740:8)—in order to recoup the kickback paid to the runner. (*Id*. 249:16-250:5, 673:11-14, 1349:23-1340:7.) It also indicates that the patient is getting paid, which suggests that the patient is seeking or continuing treatment for financial rather than medical reasons. (*Id*. 672:15-673:5.) Indeed, evidence at trial established that two undercover FBI agents who were faking that they had been injured in a car accident succeeded in getting paid to attend treatments at Comp Rehab; it is not a stretch to infer that Comp Rehab's practice of paying runners and patients incentivized other members of the community to do the same, an inference that was consistent with Forthun's own stated suspicions, caught on undercover recording, about why an individual referred by the undercover agent wanted to treat at Comp Rehab—to make money.

The insurance company witnesses testified about a whole host of ways that insurance companies would take steps to protect their own economic welfare if they learned that a chiropractor was paying runners to recruit and refer patients. They testified that if they learned of runner payments, they would conduct a more rigorous investigation to evaluate the merits of the claim and the reasonableness and necessity of the treatments billed by the chiropractor, including requesting and reviewing medical files, speaking to the chiropractor, and reviewing the accident reports. (*Id*. 571:1-573:12, 643:2-643:6, 657:20-659:10, 670:15-672:5, 977:25-979:1, 1348:11-1349:12.) As one insurance company witness testified, "it has been my experience, doing this for 15 years, I've done runner cases all over the nation, I've never seen an instance where you just have runners and nothing else. The runners tend to be indicative of all the other stuff that's going on. . . . . In my career, every time there was a capper or runner, those—one—if not a number

5

of those things were present, and where you're headed, yes, we were cheated, defrauded, however you want to put it." (*Id.* 573:22-574:1; 612:11-14.)

Forthun's argument improperly tries to segregate the practice of using runners from the question of the medical necessity and reasonableness of the treatment. But the involvement of runners is a part of the equation in determining medical necessity and reasonableness. The insurance company witnesses gave extensive testimony about how knowledge of the involvement of runners would inform the evaluation of whether the services were necessary and reasonable. The question was put squarely to at least one insurance company witness:

> Q: [D]oes the involvement of a runner have any bearing on Liberty Mutual's ability to determine whether a patient is getting medically necessary and reasonable treatment?
>
> . . . .
>
> A: It would.

(*Id.* 1370:18-25.) By their conduct, the defendants deprived the insurance companies of information that is important to a fair assessment of the validity of the claim, including the necessity and reasonableness of the chiropractic treatments.[1]

---

[1] The jury instructions in this case (*see* Jury Instructions at 25) properly instructed the jury that violations of the mail and wire fraud statutes can be sustained based on a deprivation of intangible property rights, such as the right to information relevant to the victim's economic welfare, or the right to control spending, or the right to determine for itself a fair value of the underlying transaction. *See United States v. Shyres*, 898 F.2d. 647, 652-653 (8th Cir. 1990) (affirming a mail fraud conviction involving kickbacks on the ground that "even if all the invoices represented services actually performed," the jury could have found that the defendants deprived the victim of information relevant to its economic welfare concerning the existence of the kickback scheme); *United States v. Hawkey*, 148 F.3d 920, 924 n.6 (8th Cir. 1998) ("[T]he deprivation of the right to control spending can

In addition, although the government was not required to prove a lack of medical necessity or reasonableness, the testimony from insurance company witnesses about the connection between runner payments and medically unnecessary and unreasonable services supports the inference that Forthun and Humenny billed for medically unnecessary or unreasonable services. This inferences is well supported by other evidence in this case showing Comp Rehab's habitual use of runners to whom they paid more than $500,000 for recruiting patients. That evidence did not exist in a vacuum; it accompanied by all the other evidence in the trial, which Forthun fails to acknowledge. The jury heard from Ali Abikar, Abdinasir Abikar, Darryl Humenny, Sahal Warsame, and Z.C. that, among other things, it was commonly known in the community that you could get paid for treating at Comp Rehab, (*id.* 494:17-24, 702:16-20, 1007:4-8, 1059:8-16), the patient was required to attend a minimum number of visits before the runner and, in turn, the patient would be paid, (*id.* 739:20-741:3, 1067:13-14, 1074:6-7, 1083:13-19), the minimum number of visits applied to all patients regardless of their unique condition (*id.* 741:5-8), the runners were expected to pay the patients they had referred to make sure they attended their treatments (*id.* 688:3-6), most patients received essentially the same treatment plan regardless of their unique condition (*id.* 737:15-738:12), and the treatment plan was designed to maximize

---

serve as the basis for a mail fraud conviction.") (quotation omitted); *United States v. Riley*, 621 F.3d 312, 332-33 (3d Cir. 2010) (nondisclosed relationship between mayor and purchaser of city property was material "even if the relationship would not have per se barred [the purchase]"); *United States v. Rodolitz*, 786 F.2d 77, 80-81 (2d Cir. 1986) ("To sustain the conviction, the government needed to prove only that [the defendant] employed a deceptive scheme intending to prevent the insurer from determining for itself a fair value of recovery.").

payment from the insurance companies and build a pain-and-suffering case for the patient (*id.* 728:11-15, 741:9-19, 743:1-8, 754:8-12, 955:17-21).

In addition, the jury heard and saw evidence in the form of undercover recordings and voluminous text messages that revealed that the model at Forthun's clinic was designed to maximize payment from the insurance companies.  The text messages included an example of Forthun acknowledging that patients would stop coming for treatment if they were not paid (Govt. Ex. 78 at 6) and that the treatment plan was preordained based on the likelihood of getting paid by the insurance companies (Govt. Ex. 78 at 3).  Forthun himself summed it up nicely in one of the undercover recordings (Govt. Ex. 12):

> [A]t the end of the day, if he's injured and he wants to treat, that's one thing. . . . But there's literally nothing in it for him. . . . . So that's where it's at, so I mean, if this guy really isn't that hurt . . . I mean he's hurt . . . but it's one of those things that we can treat him and get him better pretty quickly . . . there's nothing in it for him other than getting better and that's fine . . . [B]ut I also gotta be realistic, what is this guy's true intention.  He wants to get better but he also wants to get some money out of it, right? . . . I'm not an idiot, you're not an idiot. . . . I mean there is nothing in it for him . . . unless he gets a little of that front end, but that's peanuts.

Although the government did not call an expert to opine on specific patients or patient files, the government did call an expert to provide the jury with general principles of how medically necessary and reasonable chiropractic is practiced (Trial Tr. 1432:19-1454:10).  Those general principles, which were not disputed by the defense, stood in stark contrast to the practice at Comp Rehab of using runners; formulating treatment plans based on a police report, an oral account from a runner, or a prediction about how much an insurance company will pay; insisting on a predetermined, minimum number of treatments;

and coaching patients about the importance of following the treatment plan so that a larger settlement can be obtained. The expert also confirmed exactly what the insurance company witnesses said about the inextricable link between the use of runner and the concern about medical necessity and reasonableness. (*Id*. 1454:15-1455:10.) Frankly, as the government has argued during the course of this litigation, such testimony from the insurance company witnesses and the expert, coupled with the proof that Comp Rehab used runners to obtain patients, is sufficient to permit the reasonable inference that the services were exaggerated, inflated, or otherwise unnecessary or unreasonable.

## II.    Hussein's Motion For Judgment Of Acquittal

As the first basis for his motion for judgment of acquittal, Hussein claims that the evidence failed to establish that the insurance companies were harmed. As an initial matter, criminal violations of the mail fraud statute do not require proof of actual harm. *See United States v. Lamoreaux*, 422 F.3d 750, 754 (8th Cir. 2005) ("It is well-settled in this circuit that, to prove a scheme to defraud, the government need not prove actual harm.") Instead, all that is required is an intent to defraud, an intent to deprive the victim of property or property rights. As explained above in response to Forthun's argument regarding materiality, the evidence established both an intent to deprive and actual deprivation of property and property rights. Testimony of insurance company witnesses established that learning about the existence of runner payments could form the basis for the insurance company denying payment. The evidence established that if the insurance companies learned about the existence of runner payments, they would have investigated further and incorporated the knowledge of runner payments (and the mischief that accompanies such

payments) into their own evaluation of medical necessity and reasonableness, as they are entitled to do. The evidence also established that insurance companies could have cited runner payments as a basis to pursue an action to recover money already paid to the chiropractor if the existence of runner payments was discovered after the insurance company had already paid. The fraud scheme in which the defendants participated was intended to prevent insurance companies from learning that Comp Rehab was using runners to obtain its patients, which had the intent to deprive, and the effect of depriving, the insurance companies of tangible and intangible property rights.

Hussein next claims that the evidence failed to prove that he violated Minn. Stat. § 609.612, Minnesota's "runner statute." But, as the Court's jury instructions made clear, (*see* Jury Instructions at 36), the runner statute was relevant only to the jury's consideration of whether a scheme to defraud existed and whether the defendants had intent to defraud. The government was not required to prove that Hussein actually violated the runner statute in recruiting and referring patients to Forthun's clinics.[2]

Hussein also contends that judgment of acquittal is warranted because the evidence failed to prove that he had intent to defraud. Hussein claims there was no evidence of his

---

[2] Although it is not essential to the Court's evaluation of the issues, Hussein's analysis misapplies the so-called "exceptions" to the statutory definition of a runner. The so-called exceptions identify situations when it is not unethical for a chiropractor to initiate, directly or through someone else, contact with a prospective patient. The co-called exceptions do not specify situations when it is not illegal for a runner to recruit and refer patients in exchange for payment on a per-patient basis. More to the point, the evidence established that it is no less important—i.e., material—to the insurance company if the patient referred by the runner in exchange for payment was a friend or family member or a total stranger who initiated contact with the runner. (Trial Tr. 1367:15-23.)

involvement in the decision to treat patients or what treatment would be prescribed, no evidence of his involvement in billing for unnecessary or unreasonable services, no evidence that he took steps to hide from insurance companies, and no evidence that he pressured patients to attend appointments or lie to insurance companies. There was, however, evidence that Hussein demanded and received payment in exchange for being a patient—a fact that was concealed from the insurance company by virtue of the payment having been in the form of cash, and by virtue of neither Hussein nor Humenny disclosing it to the insurance company, and by virtue of Hussein refusing to attend an examination under oath or an independent medical examination. (Trial Tr. 589:5-15, 596:3-9, 758:12-759:3.) There was also evidence that, as with all of the runners, the kickback payments to Hussein would not be paid until after patients attended the predetermined number of treatments, a fact that belies Hussein's claim that he had no involvement in cajoling patients to attend treatments. (*Id.* 762:4-14.) In addition, Humenny testified that as a general matter, the expectation of all runners was that they would be responsible for paying the patients to get them to treat, for making sure the patients they had referred were coming to their appointments, and for educating the patients they had referred to make up an excuse as to how they ended up treating at Comp Rehab if they were asked by an insurance company. (*Id.* 703:5-704:20, 718:2-23, 741:9-19, 742:17-25.) Humenny's testimony was corroborated by a patient, N.M., who testified that Hussein promised her $2,000 if she and her daughter would treat at Comp Rehab and that Hussein told N.M. that she would not earn the payment until after she attended a certain number of treatments. (*Id.* 441:20-444:24, 448:1-17.)

The jury also was entitled to consider evidence of Hussein's runner activities for another chiropractor, Angela Schulz, in finding that Hussein acted with intent to defraud. That evidence included text messages making clear that part of Hussein's job as a runner was to "fix the problem" of the patients he had referred to the clinic not coming to their treatments and that one of his referred patients was "a piece of sh--" because she had only gone to 11 total visits in approximately two months. (*Id.* 1262:19-1264:17, Govt. Ex. 126.)

### III.   Luna's Motion For Judgment Of Acquittal

Luna, like Forthun and Hussein, claims that evidence of the defendants' efforts to deceive the insurance companies about how Comp Rehab was obtaining its patients does not constitute a fraud unless the treatment was not medically necessary and reasonable. As previously stated, the argument misstates the test for materiality, which is simply whether the information is capable of influencing the decision of the insurance company. Insurance company witnesses testified that they could deny payment based on learning that the patient had been obtained through a runner payment, and they provided extensive testimony about all the various ways that knowing about runner payments would influence their decision about how to handle a claim, whether to conduct an investigation of that claim or its related chiropractic billings, or whether to open a broader investigation into the entirety of the chiropractic clinic and the runners being used by the clinic.

Luna claims that the billing forms contain no place where a chiropractor could indicate that a runner had been used to obtain a patient. He contends, therefore, that the insurance companies "should bear the responsibility to inquire about patient referrals" and that their failure to take steps to obtain that information shows that the information is not

material. Luna cites no authority in support of this novel theory, and it appears that none exists. More importantly, the argument overlooks the ample evidence that was elicited about the steps that the defendants took to make sure that the insurance companies did not find out about their arrangement, including that (1) Forthun lied to an insurance company when asked directly whether he used runners, (2) the kickbacks were made in the form of cash to prevent a paper trail, (3) false descriptions were placed in the memo lines of checks they used to obtain that cash, (4) Forthun and Humenny used the runners as a vehicle to pay the patients to avoid the risk involved in paying patients directly, and (5) Luna instructed one of his patients not to tell anyone that he had solicited her. (*Id.* 238:21-238:4, 705:18-706:4, 716:1-717:18, 1310:6-13.) Such evidence of affirmative efforts to conceal, deceive, or create a false impression are sufficient to support a fraud conviction. *See United States v. Steffen*, 687 F.3d 1104, 1113 (8th Cir. 2012) ("[E]ven in the absence of a fiduciary, statutory, or other independent legal duty to disclose material information, common-law fraud includes acts taken to conceal, create a false impression, mislead, or otherwise deceive in order to prevent [another] from acquiring material information."); *United States v. Bradley*, 644 F.3d 1213 (5th Cir. 2011) (holding that evidence that the defendants concealed their practice of billing for recycled pharmaceuticals was sufficient to support a fraud conviction even if it were the case that the insurer could not have denied payment based solely on the fact that the pharmaceuticals had been recycled): *United States v. Gallant*, 537 F.3d 1202, 1228 (10th Cir. 2008) (evidence of "deceitful concealment of material facts" that are designed to "induce a false belief and resulting action to the advantage of the misleader and the disadvantage of the misled" is sufficient to support

13

fraud convictions even if the defendant owed no affirmative duty to speak); *United States v. Colton*, 231 F.3d 890, 902-03 (4th Cir. 2000) (holding that omissions constitute fraud when the purpose of such an omission is to conceal information in a manner that "is intended to induce a false belief and resulting action to the advantage of the misleader and the disadvantage of the misled."); *United States v. Aubin*, 87 F.3d 141, 146 (5th Cir. 1996) (affirming bank and wire fraud convictions because the evidence showed that the defendants knew they had to conceal the true nature of the transaction if their scheme was to succeed); *United States v. Richman*, 944 F.2d 323, 333, n.11 (7th Cir. 1991) (rejecting a "no duty to disclose" argument, as well as a jury instruction to that effect, on the ground that the evidence showed that it was well known to the defendant and the whole community that he was prohibited from paying an insurance adjuster under the table to obtain information and that the defendant concealed the relationship and scheme from the insurance company)

Luna next claims that the evidence fails to prove that he acted with intent to defraud. The Court properly instructed the jury that they were permitted to consider "any statements made and acts done by the defendant outside of trial, and all the facts and circumstances in evidence which may aid in a determination [of] the defendant's knowledge or intent. You may, but are not required to, infer that a person intends the natural and probable consequences of acts knowingly done or knowingly omitted." (Jury Instructions at 40.) The jury also was instructed that they "may use reason and common sense to draw deductions or conclusion from facts which have been established by the evidence in the case." (*Id*. at 2.) There was ample evidence on which the jury could infer

Luna's fraudulent intent, both with respect to the conspiracy count and the two substantive counts pertaining to A.O., a patient for whom Luna had been paid to recruit for treatment at Comp Rehab. Humenny's testimony about the way the kickback payments were withheld until after 6 to 12 visits, evidence of text messages between Humenny and Forthun regarding Luna's referral of A.O., the fact that Luna was paid the kickbacks in cash whereas his payments for the legitimate work of transportation were made by check, and Humenny's testimony about the expectations imposed on all of the runners, permitted the jury to make deductions and draw inferences about Luna's intent. And, of course, all of that circumstantial evidence was in addition to the direct evidence of Luna having instructed one patient he had referred, E.G., not to tell anyone that he had solicited her to treat at Comp Rehab and that he had paid A.O's mother after A.O. had attended one or two treatments at Comp Rehab. Based on all the evidence elicited at the trial, the natural inference is that Luna's intent in so instructing E.G. was to prevent the insurance company from learning that he had solicited her and referred her to Comp Rehab.[3] This same evidence rebuts Luna's assertion that there was no evidence that he knew what he was doing was fraudulent, wrong, or otherwise illegal.

---

[3] Relatedly, Luna claims that the evidence failed to prove that his recruitment of E.G. in exchange for payment was something that was material to E.G.'s insurance company, and he points to the fact that no representative of E.G.'s insurance company testified as a witness. But E.G. was not one of the substantive counts, and, thus, there was no need to call a witness from that insurance company. Instead, the relevance of Luna's recruitment of E.G. was to Luna's fraudulent intent—his instruction that E.G. not tell anyone that he had solicited her—not to the issue of materiality.

Luna also claims that there was no evidence that he was aware of the Minnesota runner statute or that his conduct of recruiting and referring patients in exchange for payment violated state law, and, for that reason, the evidence failed to show that he joined an agreement and did so with fraudulent intent. Although the existence of the runner statute is probative of the issue of whether Luna had fraudulent intent, there is no requirement that the evidence prove that Luna was aware of the state statute. All that is required is that the evidence prove that Luna had fraudulent intent. As previously explained, the evidence was sufficient for a reasonable jury to find that Luna had fraudulent intent, and the evidence of Luna having received money for recruiting and referring patients, including A.O. and E.G., demonstrates his voluntary and intentional joining of the agreement.

The remainder of Luna's arguments fall into one of two categories: (1) areas where, according to him, the evidence failed to prove a particular allegation in the indictment or a particular theory of the evidence that had been articulated by the government during the course of the trial or the litigation leading up to it, or (2) conclusions or inferences that could have been drawn from the evidence that would have been inconsistent with a finding that Luna had fraudulent intent. As to the former category, although the government does not concede that it failed to prove a particular allegation or theory, any such failures would not form the basis for judgment of acquittal so long as the evidence nonetheless proved each of the elements of the offense. (*See* Jury Instructions at 24, 27.) As to the latter category, it was for the jury to decide what conclusions and inferences to draw from the evidence, and the Court must accept all reasonable inferences that support the verdict, even if it would have been possible for the jury to draw inferences going the other way. Keys,

721 F.3d at 518-19. The inferences the jury made in this case were reasonable and supported by the evidence and should therefore be upheld.

## CONCLUSION

The evidence was sufficient for the jury to find the defendants guilty of each of the crimes with which they were charged. The evidence supported the jury's finding that the omitted/concealed runner payments was information that was material to the insurance companies. The evidence also showed that the object of scheme involved an intent to deprive the insurance companies of property and property rights. The evidence was sufficient to permit the jury to find that Hussein and Luna both had fraudulent intent and that they both voluntarily and intentionally joined in an agreement with Forthun and Humenny, the purpose of which was to obtain money from insurance companies while preventing the insurance companies from learning material information. The Court should deny all three of the defendants' motions for judgment of acquittal.

Dated: February 1, 2018

Respectfully Submitted,

GREGORY G. BROOKER
United States Attorney

*s/ John Kokkinen*

BY: JOHN KOKKINEN
AMBER M. BRENNAN
Assistant U.S. Attorneys
600 U.S. Courthouse
300 South Fourth Street
Minneapolis, Minnesota 55415
612-664-5600