## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

UNITED STATES OF AMERICA,

        Plaintiff,

v.

(1) PRESTON ELLARD FORTHUN,
(5) ABDISALAN ABDULAHAB HUSSEIN, and
(6) CARLOS PATRICIO LUNA,

        Defendants.

**MEMORANDUM OF LAW & ORDER**
Criminal File No. 16-339 (MJD/BRT)

John E. Kokkinen, Amber M. Brennan, and David Michael Maria, Assistant United States Attorneys, Counsel for Plaintiff.

Andrew S. Birrell and Ian S. Birrell, Gaskins Bennett Birrell, LLP, Counsel for Defendant Preston Ellard Forthun.

R. J. Zayed, Dorsey & Whitney LLP, Counsel for Defendant Abdisalan Abdulahab Hussein.

Charles L. Hawkins, Charles Hawkins Law, Counsel for Defendant Carlos Patricio Luna.

## I.    INTRODUCTION

    This matter is before the Court on Defendant Forthun's Motion for

Judgment of Acquittal Pursuant to Rule 29(c) of the Federal Rules of Criminal

Procedure [Docket No. 421]; Defendant Luna's Post-trial Motion for Judgment of Acquittal [Docket No. 423]; and Defendant Hussein's Renewed Motion for Judgment of Acquittal Pursuant to Fed. R. Crim. P. 29 [Docket No. 425]. Because the Court concludes that the evidence is sufficient for a reasonable jury to find Defendants guilty of all Counts beyond a reasonable doubt, Defendants' motions are denied.

## II.    BACKGROUND

The Second Superseding Indictment charged Defendants Preston Ellard Forthun, Abdisalan Abdulahab Hussein, and Carlos Patricio Luna with Count 1: Conspiracy to Commit Mail Fraud and Wire Fraud in violation of 18 U.S.C. § 1349 (all Defendants); Counts 2-7: Mail Fraud in violation of 18 U.S.C. §§ 2, 1341 (Counts 2-4: Forthun; Counts 5-6: Forthun, Hussein; Count 7: Forthun, Luna); and Counts 8-14, Wire Fraud in violation of 18 U.S.C. §§ 2, 1343 (Counts 8-11: Forthun; Counts 12-13: Forthun, Hussein; Count 14: Forthun, Luna). [Docket No. 332]

On October 16, 2017, a jury found each Defendant guilty of all counts against him. [Docket Nos. 393-95] During trial, Forthun's former partner, chiropractor Darryl Humenny, testified as a cooperating witness for the

Government.   [Docket Nos. 363-64]  All three Defendants now move for judgment of acquittal.

### III.    DISCUSSION

#### A.    Standard for Judgment of Acquittal

Under Federal Rule of Criminal Procedure 29(a), "the court on the defendant's motion must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction."  In deciding the motion, the Court does "not weigh the evidence or assess the credibility of witnesses; that is the province of the jury."  United States v. White, 794 F.3d 913, 918 (8th Cir. 2015).  The Court views the evidence and all reasonable inferences from it in the light most favorable to the verdict.  Id.  "[D]rawing all reasonable inferences in favor of the verdict, there must be an interpretation of the evidence that would allow a reasonable minded jury to find the defendant[ ] guilty beyond a reasonable doubt."  Id. (citation omitted). "This strict standard permits overturning a jury's guilty verdict only if no reasonable jury could find the defendant guilty beyond a reasonable doubt."  Id.

#### B.    Materiality

## 1.     Materiality Standard

A misrepresentation or omission can only sustain a mail or wire fraud conviction if it is material.  See, e.g., United States v. Heppner, 519 F.3d 744, 748-49 (8th Cir. 2008).  "In general a falsehood is material if it has a natural tendency to influence, or [is] capable of influencing, the decision of the decisionmaking body to which it was addressed."  Id. at 749 (citation omitted).  As this Court instructed the jury:

> A representation or promise is "material" if it has a natural tendency to influence, or is capable of influencing, the decision of a reasonable person in deciding whether to engage or not to engage in a particular transaction.  However, whether a representation or promise is "material" does not depend on whether the person was actually deceived.  You may only find a defendant guilty if a misrepresentation involved was "material."  If you find misrepresentations were made but those misrepresentations were not material, you must find a defendant not guilty.

(Jury Instruction Nos. 15-16.)

All three Defendants argue that the Government failed to prove the materiality requirement of the fraud and conspiracy charges.

## 2.     Defendants' Argument

Defendants argue that the evidence at trial showed that insurers' decisions to pay for claims depended on whether the medical care billed was actually

provided to the insured and was reasonably medically necessary. They assert that proof that a runner was used was not a basis to deny a claim. They further argue that the evidence showed that the treatments that Forthun and Humenny billed for were medically necessary and actually given. Defendants conclude that the insurance companies were not victims because they were required to pay for the medically necessary care and the nondisclosure of runner payments was not material.

The test for materiality is whether the information is capable of influencing the decision of the insurance company. Here, insurance company witnesses testified that they could deny payment based on learning that the patient had been obtained through a runner payment, and they provided extensive testimony about how knowing about runner payments would influence their decision on how to handle a claim, whether to conduct an investigation of that claim or its related chiropractic billings, or whether to open a broader investigation into the entirety of the chiropractic clinic and the runners being used by the clinic. A reasonable jury could find, beyond a reasonable doubt, that the Government proved materiality.

### 3.    Insurer Testimony

There was sufficient insurer testimony to support a reasonable jury finding beyond a reasonable doubt that the use of runners and payments to runners to recruit patients was material.  Insurance company witnesses testified that insurance companies considered use of runners as "a representation of suspect activity on a claim," and, if they knew that a runner was being used, insurance companies would question the validity of the claim and would launch an investigation.  (See Trial Tr. 238-39, 257-58 (Rene Neilson Berg) (Farmers Insurance Exchange).)  Berg testified that Farmers would "not necessarily" deny a claim simply because a runner was involved, but "the key is the entire claim, the evaluation of the entire claim."  (Id. 255.)

Insurance company witness testified that the involvement of a runner and the existence of payments to runners in exchange for recruiting and referring patients to a chiropractic clinic was important to the insurance company and would influence its decision about how to evaluate the claim and bills from the chiropractic clinic.  (See 572-76 (Aaron Cobb) (Farmers Insurance) (testifying that it was important to Farmers to know whether a chiropractor used runners because "[t]hat's probably one of the most egregious indicators, if you will, because usually the presence of the runners is going to lead to all the other type

of conduct . . . like services not rendered, upcoding, bundling, unbundling, template – what we call templating, so it has been my experience, doing this for 15 years, I've done runner cases all over the nation, I've never seen an instance where you just have runners and nothing else" and further testifying "if, in the claims handling, we understood that there was some running going on, we wouldn't pay that claim"); 638, 640-42 (Brian Prentice) (Travelers Insurance) ("[I]f we were aware of [runners being paid to recruit patients], it would be a flag for a need for additional investigation," and Travelers "would definitely investigate further to find out, you know, what was going on and potentially deny the claim, providing a policy, a contract, allows us to do so."); 670-72 (Michelle Hair) (Progressive Insurance) ("[I]f somebody's being paid to receive treatment or being paid to recruit people that receive treatment, we would question whether that treatment was actually medically necessary related to the car accident."); 977-80 (Laura Vanderwerff) (State Farm) (testifying that "[j]ust certain claims that have indicators identified on them" are sent for investigation; that the use of runners was an indicator or warning sign that State Farm looks out for when evaluating a claim; that if, before State Farm had paid a claim, it learned that a runner had been used, it "would try to meet with the insured to

get their information, to again, confirm the accident, the facts, and the injuries;" and that if, after State Farm had paid the claim, it found out that a runner had been used, it "would maybe take that information to determine, you know, is it happening on other claims that we may not have, you know, looked at initially and to see if there's other indicators on any other claims" and, potentially, "could try to collect back from the provider"); 1347-50 (Michael Struebing) (Liberty Mutual) (testifying that it is important to Liberty Mutual to know if a runner was used because "bills are not compensable if a runner is involved" and, aside from that, use of runners "is something that typically raises an insurance premium over the long ha[u]l" and use of a runner raises concerns regarding whether the treatment is medically necessary ).)

Insurance companies believe that the use of runners calls into question the entirety of the claim and the premise of insurance, which is to indemnify losses, not to make a profit for the insured.  (Trial Tr. 641 (Brian Prentice) (Travelers Insurance).)  Knowledge of a chiropractor's use of runners influences insurers' decisions about how to handle claims because it indicates that the chiropractor is inflating the treatment plan.  Humenny testified that Forthun and Humenny did plan treatments and payments to runners to ensure that a patient came to

enough treatments to at least recoup the money that they had paid to runner to bring in that patient. (Trial Tr. 739-40.) This type of inflation to recoup the kickback paid to the runner was one of the very concerns that insurers had about the use of runners. (See, e.g., Trial Tr. 672 (Michelle Hair) (Progressive Insurance) (testifying that payments to runners raise a concern that the chiropractors are performing more treatments that they otherwise would because "if they tell a runner bring me this patient and he needs to be seen ten times and then you'll receive money in return, would that patient have been seen ten times otherwise?"); 1349-40 (Michael Struebing) (Liberty Mutual) (testifying that an insurer concern from the use of runners is that "if the provider has to make up that whatever fee that they paid for the solicitor, the runner, then is the treatment that they're rendering necessary to make that person whole or better or is it to make money so that they can get the next patient to pay that fee that they have occurred for the solicitor").) Runner payments also frequently indicate that the patient is getting paid, which suggests that the patient is seeking or continuing treatment for financial reasons, rather than medical reasons. (Trial Tr. 671-72 (Michelle Hair) (Progressive Insurance).)

Trial evidence also showed that undercover agents who were faking injuries from car accidents succeeded in getting paid to attend treatments at Comprehensive Rehab Centers of Minnesota ("Comp Rehab"), which indicates that Comp Rehab's practice of paying runners and patients incentivized others to do the same.  (See, e.g., Trial Tr. 382 (Ndubisi Nwachuku) (testifying that he was paid for treating at Comp Rehab), 392 (testifying that he was paid for bringing in another undercover agent for 6 treatments at Comp Rehab).)  Forthun stated on an undercover recording that he thought an individual referred by the undercover agent wanted to treat at Comp Rehab to make money.  (Trial Tr. 385-86 (Ndubisi Nwachuku); Govt. Ex. 12 (Feb. 6, 2014, Undercover Recording).)

Insurance company representatives testified that, if they learn that a chiropractor is paying runners to recruit and refer patients, they take various steps to protect the companies' economic welfare: they would conduct a more rigorous investigation to evaluate the merits of the claim and the reasonableness and necessity of the treatments billed by the chiropractor, including requesting and reviewing medical files, speaking to the chiropractor, taking a statement from the insured, and reviewing the accident reports.  (Trial Tr. 571 (Aaron Cobb) (Farmers Insurance); 642, 656-58 (Brian Prentice) (Travelers Insurance);

669-71 (Michelle Hair) (Progressive Insurance); 977-79 (Laura Vanderwerff) (State

Farm); 1348 (Michael Struebing) (Liberty Mutual).)  Farmers Insurance

representative Aaron Cobb testified that, in his 15 years' experience working on

runner cases across the country, "I've never seen an instance where you just have

runners and nothing else.  The runners tend to be indicative of all the other stuff

that's going on. . . .  In my career, every time there was a capper or a runner,

those – one – if not a number of those things were present and where you're

headed, yes, we were cheated, defrauded, however you want to put it."  (Trial

Tr. 572-73, 612.)

Evidence at trial showed that the practice of using runners is part of the

equation in determining the medical necessity and reasonableness of the

treatment.  For example, Liberty Mutual representative Michael Struebing

testified that the involvement of a runner bore on Liberty Mutual's ability to

determine whether a patient was getting medically necessary and reasonable

treatment.  (Trial Tr. 1369.)

As the Court instructed the jury in Jury Instruction Nos. 15 and 16,

violations of the mail and wire fraud statutes can be sustained based on a

deprivation of intangible property rights.  "For example, a scheme to deprive a

company of the right to information relevant to its economic welfare, or the right

to control spending, or the right to determine for itself a fair value of the

underlying transaction would be a scheme to deprive the company of intangible

property rights."  (Jury Instruction No. 15-16.)  See also United States v. Shyres,

898 F.2d. 647, 652-653 (8th Cir. 1990) (affirming a mail fraud conviction involving

kickbacks on the ground that "even if all the invoices represented services

actually performed," the jury could have found that the defendants deprived the

victim "of information relevant to its economic welfare concerning the existence

of the kickback scheme" and thus deprived the victim "of intangible property,

the right to control the spending of its own funds"); United States v. Hawkey, 148

F.3d 920, 924 n.6 (8th Cir. 1998) ("[T]he deprivation of the right to control

spending can serve as the basis for a mail fraud conviction.") (quoting Shyres,

898 F.2d at 652); United States v. Riley, 621 F.3d 312, 332-33 (3d Cir. 2010)

(holding that nondisclosed relationship between mayor and purchaser of city

property was material "even if the relationship would not have per se barred [the

purchase]"); United States v. Rodolitz, 786 F.2d 77, 80-81 (2d Cir. 1986) ("To

sustain the conviction, the government needed to prove only that [the defendant]

employed a deceptive scheme intending to prevent the insurer from determining

for itself a fair value of recovery."). Courts "have repeatedly upheld convictions where defendants' misrepresentations in a loan or insurance application or claim exposed the lender or insurer to unexpected economic risk." United States v. Binday, 804 F.3d 558, 571 (2d Cir. 2015). The evidence was sufficient to sustain a reasonable jury's finding that, through their conduct, Defendants deprived the insurance companies of information that is important to a fair assessment of the validity of the claim, including to the necessity and reasonableness of the chiropractic treatments.

### 4.    Medically Unnecessary Care

The Court rejects Defendants' claim that acquittal is required because the Government failed to produce evidence that any particular treatments provided by Forthun or Humenny were medically unnecessary or unreasonable. In order to prove violations of the mail fraud, wire fraud, and conspiracy statutes, the Government was not required to prove that particular treatments provided lacked medical necessity or reasonableness. See, e.g., Shyres, 898 F.2d at 652 ("[A] legitimate mailing, one that contains no false information, can supply the requisite mailing element.").

Additionally, the previously discussed testimony from insurance company representatives supports the inference that Forthun and Humenny did bill for medically unnecessary or unreasonable services. This conclusion is also supported by the fact that Comp Rehab regularly used runners and paid them more than $500,000 for recruiting patients. The inference is further supported by testimony that it was commonly known in the community that you could get paid for treating at Comp Rehab (Trial Tr. 494 (Z.C.); 701 (Darryl Humenny); 1006, 1058 (Ali Abikar); 1174 (Sahal Warsame)); a patient had to attend a minimum number of visits before the runner and the patient would get paid (id. 738-40 (Darryl Humenny); 1066, 1082 (Abdinasir Abikar); 1163 (Sahal Warsame)); there was a minimum number of visits applied to all patients regardless of their medical condition (id. 740 (Darryl Humenny)); Forthun and Humenny expected the runners to pay the patients that they referred in order to make sure that they attended their treatments (id. 687 (Darryl Humenny)); most patients received the same treatment plan regardless of their medical condition (id. 736-38 (Darryl Humenny)); and the treatment plan was designed to maximize insurance company payments and to build pain-and-suffering cases for the patient (id. 727-28, 740, 742, 753-54, 954-55 (Darryl Humenny)).

The Government also presented text messages in which Forthun acknowledged that patients would stop coming for treatment once they were paid.  (Govt. Ex. 78 at 6 ("They'll stop treating if not taken care of.").)  Another text message showed that Forthun's treatment plan was designed based on the likelihood of getting paid by the insurance companies.  (Govt. Ex. 78 at 3.)  On an undercover recording, Forthun stated:

> [A]t the end of the day, if he's injured and he wants to treat, that's one thing. . . . But there's literally nothing in it for him. . . . . So that's where it's at, so I mean, if this guy really isn't that hurt . . . I mean he's hurt . . . but it's one of those things that we can treat him and get him better pretty quickly . . . there's nothing in it for him other than getting better and that's fine . . . [B]ut I also gotta be realistic, what is this guy's true intention.  He wants to get better but he also wants to get some money out of it, right? . . .  I'm not an idiot, you're not an idiot.  . . .  I mean there is nothing in it for him . . . unless he gets a little of that front end, but that's peanuts.

(Govt. Ex. 12, Feb. 6, 2014, Undercover Recording.)

The Government's expert, Dr. Joel Wulff, testified regarding how medically necessary and reasonable chiropractic treatment is practiced, including taking a thorough history from the patient and conducting an in-person patient exam before formulating a treatment plan; not formulating a treatment plan based solely on a police report; not formulating a treatment plan based on the insurance company and what it will pay; and not requiring that the patient

attend a predetermined number of visits. (Trial Tr. 1433-42, 1450-54.) Evidence

at trial showed that Comp Rehab used runners; created treatment plans based on

a police report, an oral report from a runner, or an estimate about how much the

insurer would pay; demanded a predetermined minimum number of treatment

visits; and coached patients to follow the treatment plan in order to obtain a

larger settlement. Wulff also testified that the use of a runner was linked to a

concern that the treatment was not reasonable and medically necessary. (Trial

Tr. 1453-54.)

### 5.    Concealment of Runners

Luna and Hussein note that the reimbursement forms sent to the insurance

companies, Claim Form 1500, did not contain a space for a chiropractor to

indicate that a runner had been used to obtain a patient. (Trial Tr. 654-56 (Brian

Prentice) (Travelers Insurance).) They also point out that the insurance

companies have mechanisms to investigate and attempt to determine if a

chiropractor uses runners, such as by sending a letter to a provider or insured

asking if a referral payment was made with respect to a particular patient. (See,

e.g., Trial Tr. 647-48 (Brian Prentice) (Travelers Insurance); 991-93 (Laura

Vanderwerff) (State Farm); 1373 (Michael Struebing) (Liberty Mutual).)

Defendants argue that that the insurance companies bear the responsibility to inquire about patient referrals and their failure to take steps to obtain information about referrals shows that the information was not material. The Court concludes that neither the fact that the claim form did not contain a place to note whether a runner was used nor the fact that the insurers had the ability to further investigate claims from Comp Rehab negates the finding of materiality.

Additionally, "even in the absence of a fiduciary statutory, or other independent legal duty to disclose material information, common-law fraud includes acts taken to conceal, create a false impression, mislead, or otherwise deceive in order to prevent [another] from acquiring material information." United States v. Steffen, 687 F.3d 1104, 1113 (8th Cir. 2012) (citation omitted). In this case, Defendants took multiple steps to conceal the use of paid runners and to ensure that the insurance companies did not find out about their scheme. Forthun lied to an insurance company when he was asked whether he used runners. (Trial Tr. 237-38 (Rene Nielson Berg) (Farmers Insurance Exchange).) The kickbacks were usually made in cash to avoid a paper trail. (See, e.g., Trial Tr. 713, 715, 717 (Darryl Humenny); 1173 (Sahal Warsame).) False descriptions were written in the memo lines of checks used to obtain the cash for runners.

(Trial Tr. 715-16 (Darryl Humenny).)  Forthun and Humenny used the runners to pay the patients indirectly to avoid the risk involved in paying patients directly. (Trial Tr. 687, 703-05 (Darryl Humenny).)  Humenny and Forthun instructed the runners to tell patients they referred to lie about how they were referred to Comp Rehab if they were asked by the insurance companies.  (Trial Tr. 717 (Darryl Humenny).)  Luna told one of the patients that he referred not to tell anyone that he had solicited her.  (Trial Tr. 1310 (E.G.).)

### C.    Harm to the Insurance Companies

Hussein argues that the Government failed to present evidence that the insurance companies were robbed of money, property, or property rights, because there was no evidence that the insurance companies paid claims that were not medically necessary.

Violations of the mail fraud statute do not require proof of actual harm. See United States v. Lamoreaux, 422 F.3d 750, 754 (8th Cir. 2005) ("It is well-settled in this circuit that, to prove a scheme to defraud, the government need not prove actual harm.").  Rather, the Government was required to prove an intent to defraud and deprive the victim of property or property rights.  Id.  Here, insurance company testimony established that learning about the existence of runner payments could form the basis for the insurance company denying

payment.  Insurance company witnesses testified that, if the insurance

companies had learned about the existence of runner payments, they would have

investigated further and incorporated the knowledge of runner payments into

their evaluation of medical necessity and reasonableness.  The evidence also

showed that insurance companies could have cited runner payments as a basis to

pursue an action to recover money already paid to the chiropractor if the runner

payments were discovered after the insurance company had already paid the

claim.

### D.    Violation of the Runner Statute

Hussein and Luna argue that, even if Comp Rehab's use of runners was a

material fact to the insurers, the Government failed to prove that they violated

Minnesota Statute § 609.612 by referring patients to treat at Comp Rehab.  They

argue that Minnesota Statute § 65B.54, subdivision 6, provides that an individual

is not a "runner" if certain exceptions apply.  Hussein and Luna each argue that

they fit within these exceptions with regard to the patients that they referred.

The runner statute was relevant only to the jury's consideration of whether

a scheme to defraud existed and whether the defendants had intent to defraud.

(Jury Instruction No. 18.)  The Government was not required to prove that

Hussein or Luna actually violated the runner statute.  Use of a runner was still

material to insurance companies if the patient had been referred by a runner in

exchange for payment even if the runner was a friend or family member.  (See

Trial Tr. 1367 (Michael Struebing) (Liberty Mutual).)  Additionally, the existence

of the runner statute is probative of Defendants' fraudulent intent, but there is no

requirement that the evidence prove that Defendants were aware of the statute.

Here, other evidence sufficiently proved intent.

### E.    Intent to Defraud

The crimes of mail fraud and wire fraud, and conspiracy to commit those

crimes, require that the defendant acted with the intent to defraud.  (See Jury

Instruction Nos. 13, 15-16.)  See also United States v. Lamoreaux, 422 F.3d 750,

754 (8th Cir. 2005) ("The essence of a scheme to defraud is an intent to harm the

victim.") (citation omitted).  Hussein and Luna each argue that the Government

failed to prove their intent to defraud.

In determining each Defendant's intent, the jury was permitted to consider

"any statements made and acts done by the defendant outside of trial, and all the

facts and circumstances in evidence which may aid in a determination of the

defendant's knowledge or intent.  You may, but are not required to, infer that a

person intends the natural and probable consequences of acts knowingly done or

knowingly omitted." (Jury Instruction No. 22.)  The jury was also allowed to "use

reason and common sense to draw deductions or conclusion from facts which have been established by the evidence in the case." (Jury Instruction No. 2.) Both direct and circumstantial evidence existed from which the jury could draw the inference of Hussein's and Luna's fraudulent intent.

### 1.    Defendant Hussein

Hussein argues that Humenny and Forthun made the decisions of how to treat patients without involvement from Hussein. He asserts that there is no evidence that he was aware of Comp Rehab's billing practices or that he had the ability to determine whether Humenny and Forthun were billing for medically unnecessary services. He further argues that there is no evidence that he hid his actions from anyone in a way that suggested knowledge of wrongdoing.

The Court concludes that there was sufficient evidence to support a finding of Hussein's intent. The Government presented evidence that Hussein demanded and received payment in exchange for being a patient. These payments were concealed from the insurance company because they were made in cash, neither Hussein nor Hummeny disclosed the payments, and Hussein refused to attend an examination under oath or an independent medical examination. (Trial Tr. 587-88, 595 (Aaron Cobb) (Farmers Insurance); 757-61

(Darryl Humenny).)  Also, there was evidence that the kickback payments were not paid to Hussein until after patients had attended a predetermined number of treatments (Trial Tr. 761 (Darryl Humenny)), which is evidence that Hussein was involved in pressuring patients to attend treatments.  Humenny testified that the general expectations of all runners was that they would be responsible for paying the patients to get them to treat, for making sure that the patients they had referred were coming to their appointments, and for telling the patients they had referred to make up an excuse as to how they ended up treating at Comp Rehab if they were asked by an insurance company.  (Trial Tr. 703-4, 717, 740-41.) Patient N.M.H. testified that Hussein promised her $2,000 if she and her daughter would treat at Comp Rehab and that Hussein told N.M.H. that she would not earn the payment until after she attended a certain number of treatments.  (Trial Tr. 440-43, 447.)

Evidence of Hussein's runner activities for chiropractor Angela Schulz further support a finding of his intent to defraud.  Text messages show that part of Hussein's job as a runner for Schulz was to "fix the problem" of the patients he had referred not coming to their treatments and that he was aware that the chiropractor considered one of Hussein's referrals to be "a piece of sh**" because

she had only gone to 11 appointments.  (Trial Tr. 1261-63 (Sammany Spangler);

Govt. Ex. 126.)

### 2.    Defendant Luna

Like Hussein, Luna argues that there was no evidence of fraudulent intent

and that he intended to be part of a marketing campaign and believed that his

actions were legal.  The Court concludes that there was sufficient evidence of

intent to sustain the verdict.  Luna instructed E.G. not to tell anyone that he had

solicited her to treat at Comp Rehab.  (Trial Tr. 1310 (E.G.).)  Luna paid A.O.'s

mother after A.O. had attended one or two treatments at Comp Rehab.  (Trial Tr.

1220 (C.O.).)  Humenny testified that, generally, kickback payments were

withheld until after 6 to 12 visits.  (Trial Tr. 703, 710, 738-40 (Darryl Humenny).)

There were text messages between Humenny and Forthun about Luna's referral

of A.O.  (Trial Tr. 772-77 (Darryl Humenny).)  Luna was paid kickbacks in cash

while his payments for his legitimate transportation work were by check.  (Trial

Tr. 713 (Darryl Humenny); 310, 318, 353 (Jonathan Ferris); Govt. Ex. 70.)

Humenny testified that, generally, all runners were told to tell the referred

patients to lie to the insurance companies about how they were referred.  (Trial

Tr. 717.)  Taken together this evidence led to the inference that Luna's intent in

instructing E.G. was to prevent the insurance company from learning that he had

solicited her and referred her to Comp Rehab.  Overall, there is sufficient

evidence of Luna's fraudulent intent.


Accordingly, based upon the files, records, and proceedings herein, **IT IS**

**HEREBY ORDERED**:

1. Defendant Forthun's Motion for Judgment of Acquittal Pursuant
   to Rule 29(c) of the Federal Rules of Criminal Procedure [Docket
   No. 421] is **DENIED**.

2. Defendant Luna's Post-trial Motion for Judgment of Acquittal
   [Docket No. 423] is **DENIED**.

3. Defendant Hussein's Renewed Motion for Judgment of Acquittal
   Pursuant to Fed. R. Crim. P. 29 [Docket No. 425] is **DENIED**.



Dated:  April 5, 2018                    s/ Michael J. Davis
                                         Michael J. Davis
                                         United States District Court